IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

JOSEPH E. PRESTON,

    Plaintiff,

v.                        Civil Action No. 3:19-cv-00750

CITY COUNCIL OF
THE CITY OF PETERSBURG,
et al.,

    Defendants.

## MEMORANDUM OPINION

This matter is before the Court on two summary judgment motions: one from Tribune Broadcasting Co. II, LLC ("Tribune" or "WTVR") and one from the City Council of the City of Petersburg ("City Council") along with the individual City Council members (i.e., Treska Wilson-Smith, Darrin Hill, Samuel Parham, Charlie Cuthbert, W. Howard Myers, Annette Smith-Lee, and John A. Hart, Sr.). Tribune requests that the Court grant its MOTION FOR SUMMARY JUDGMENT ("Tribune Motion for Summary Judgment") (ECF No. 47) and enter judgment in its favor on Count III of the Amended Complaint ("AC") (ECF No. 20). The City Council and the individual City Council members (together the "City Defendants") request that the Court grant their MOTION FOR SUMMARY JUDGMENT ("City Motion for Summary Judgment") (ECF No. 49) and enter judgment in their favor on Counts I, II, and IV. The City Defendants further request that

the Court award them costs and attorneys' fees.  For the reasons
set forth below, the Tribune Motion for Summary Judgment (ECF No.
47) will be granted and the City Motion for Summary Judgment (ECF
No. 49) will be granted in part and denied in part. The City
Defendants' request for costs and attorneys' fees is improperly
joined with the City Motion for Summary Judgment, and in any event,
the request is not documented.  Hence, it will be denied without
prejudice.

## I.   BACKGROUND

This case arises out of events that occurred at a meeting of
the Petersburg City Council at which the City Council passed two
motions, one terminating Plaintiff Joseph E. Preston from his job
as the city attorney and one restricting his ability to enter City
Hall.  Preston now sues the City Defendants for breach of contract,
defamation, and a violation of his constitutional rights.  Preston
also sues Tribune, owner of local news station, WTVR, for WTVR's
erroneous, and allegedly defamatory, news report of Preston's
termination.  The following facts are presented in the light most
favorable to Preston, and Preston is afforded the benefit of all
reasonable inferences.

### A.   Preston's Termination

Preston served as the City Attorney for the City of Petersburg
from October 10, 2016 to September 4, 2018.  Tribune Summ. J. Mem.
¶ 1, ECF No. 48; PLS' RESP. OPP'N. TRIBUNE MOT. SUMM. J. at 3, ECF

2

No. 55.   As city attorney, Preston attended every City Council meeting until the meeting on September 4, 2018.   Tribune Summ. J. Mem. ¶ 1, ECF No. 48.

On September 4, 2018, the City Council held a special meeting at the Union Train Station rather than at City Hall, as usual. PLS' RESP. OPP'N. TRIBUNE MOT. SUMM. J. at 3, ECF No. 55.   Preston was not present, being on vacation.   PLS' RESP. OPP'N. TRIBUNE MOT. SUMM. J. at 3, ECF No. 55.   In fact, Preston did not know about the meeting or that his termination was being discussed. PLS' RESP. OPP'N. CITY MOT. SUMM. J. at 7, ECF No. 56.

After a period in closed session, the City Council returned to open session and unanimously approved a motion to terminate Preston and a motion to restrict his ability to enter City Hall. Ex. 2, ECF No. 55-2.   The first motion, introduced by Council Member Treska Wilson-Smith, terminated Preston as City Attorney, effective immediately.   The motion contained the curious language that "[t]o the extent that contractual provisions, if any[,] may apply, Mr. Preston is terminated for cause."   Ex. 2, ECF No. 55-2.   However, no "cause" was listed in the motion.   PLS' RESP. OPP'N. CITY MOT. SUMM. J. at 7, ECF No. 56.

The second motion, introduced by Council Member Charles Cuthbert, stated:

> I move that Council hereby instructs the Clerk of
> Council to notify Joseph E. Preston, in writing, hand
> delivered immediately, of his dismissal and that he

> may enter City Hall, to retrieve personal items or otherwise, only by appointment and only if accompanied by a police officer of the Petersburg Police Department, such officer to be designated by the City Manager or her representative upon the request of Mr. Preston.

Ex. 1, ECF No. 55-1; PLS' RESP. OPP'N. TRIBUNE MOT. SUMM. J. at 3, ECF No. 55. As was the case with the first motion, there was no reason cited in support of the second motion.

The special meeting adjourned at 6:33 PM. PLS' RESP. OPP'N. TRIBUNE MOT. SUMM. J. at 3, ECF No. 55.

### B.   News Coverage of Preston's Termination

At 7:03 PM, the Petersburg City Manager, Aretha Ferrell-Benevides, who had been at the special meeting, Ex. 2, ECF No. 55-2, texted Wayne Covil, a senior WTVR reporter, saying, "They just fired joe." Ex. 2 at 5, ECF No. 48-2. Covil responded, "Wow. Good for them. Thx for letting me know[.] Is he even there?" Ex. 2, ECF No. 48-2. To which Ferrell-Benevides replied, "Nope[.] Immediately and to only be allowed back to pack under supervision."[1] Ex. 2, ECF No. 48-2. Covil responded, "Wow. That's

---

[1] From this exchange, Preston argues that Covil had "actual knowledge" that Preston was never present at the meeting. PLS' RESP. OPP'N. TRIBUNE MOT. SUMM. J. at 4, ECF No. 55. For his part, Covil submitted a declaration saying that he "did not understand the text message [he] received from the City Manager to mean that Mr. Preston had never been at the meeting." Ex. 2 at 3, ECF No. 48-2.

intense for them." Ex. 2, ECF No. 48-2.[2]

A game of telephone then commenced. Covil called WTVR's late-night news producer, Jennifer Carr, to inform her of Preston's termination. PLS' RESP. OPP'N. TRIBUNE MOT. SUMM. J. at 4, ECF No. 55. There is no evidence suggesting that Covil told Carr that Preston was not at the meeting or that Covil gave Carr the actual text of his exchange with Ferrell-Benevides, the city manager. See PLS' RESP. OPP'N. TRIBUNE MOT. SUMM. J. at 4, ECF No. 55; Tribune Summ. J. Mem. ¶ 4, ECF No. 48.

Carr, in turn, called Jon Burkett, a reporter for WTVR, and sent him to the public City Council meeting (held after the special meeting) to cover the story.[3] PLS' RESP. OPP'N. TRIBUNE MOT. SUMM. J. at 4, ECF No. 55. Although Burkett was, in theory, a general assignment reporter, in practice, he primarily covered crime, and he had not had occasion to attend many city council meetings. PLS' RESP. OPP'N. TRIBUNE MOT. SUMM. J. at 4, ECF No. 55.

Burkett arrived at the public meeting approximately one hour after it started and made his way to the back of the room. PLS'

---

[2] The record does not disclose why the City Manager notified the media by text, rather than by a press release. Nor does the record explain Covil's expression of approval: "Wow. Good for them."

[3] Covil's shift ended roughly around the time that he received the text message from Ferrell-Benevides. Tribune Summ. J. Mem. ¶ 4, ECF No. 48. After Covil told Jennifer Carr about Ferrell-Benevides' message, Covil had no further involvement with the Preston story. Tribune Summ. J. Mem. ¶ 4, ECF No. 48.

RESP. OPP'N. TRIBUNE MOT. SUMM. J. at 4, ECF No. 55. There, he briefly interacted with the Chief of Public Safety who Burkett knew from his normal crime beat. See PLS' RESP. OPP'N. TRIBUNE MOT. SUMM. J. at 4, ECF No. 55. Burkett made no attempt to discuss the Preston story with the Chief of Public Safety (although he would often want to talk to a member of command staff for his crime stories). See PLS' RESP. OPP'N. TRIBUNE MOT. SUMM. J. at 4, ECF No. 55.

While at the City Council meeting, Burkett spoke to someone named Michael Edwards who Burkett knew and who "regularly attended Petersburg City Council meetings and was knowledgeable about events in Petersburg."[4] Tribune Summ. J. Mem. ¶ 6, ECF No. 48. Edwards confirmed that Preston had been terminated. Tribune Summ. J. Mem. ¶ 7, ECF No. 48. Edwards also went on to say that, if Preston were "'to come back on property there's a resolution or a motion that council has put out that says he cannot come back without an escort.'" PLS' RESP. OPP'N. TRIBUNE MOT. SUMM. J. at 5, ECF No. 55; Tribune Summ. J. Mem. ¶ 7, ECF No. 48.

Burkett remained at the public meeting for approximately 45 minutes to an hour and took video to use in his report. Tribune Summ. J. Mem. ¶ 5, ECF No. 48. He did not see Preston at the

---

[4] Because the meeting was ongoing, Burkett and Edwards spoke only in whispers, Tribune Summ. J. Mem. ¶ 6, ECF No. 48, and their conversation was quite brief. PLS' RESP. OPP'N. TRIBUNE MOT. SUMM. J. at 5, ECF No. 55.

meeting during that time, PLS' RESP. OPP'N. TRIBUNE MOT. SUMM. J. at 4, ECF No. 55, and the City Council made no mention of Preston's termination. Tribune Summ. J. Mem. ¶ 5, ECF No. 48.

Burkett knew that an attorney was usually present at council meetings. Tribune Summ. J. Mem. ¶ 8, ECF No. 48. So based on his knowledge of the motion restricting Preston's ability to enter City Hall and the fact that Preston was not at the meeting, Burkett came to the conclusion that Preston had been at the meeting, but had been escorted out.[5] PLS' RESP. OPP'N. TRIBUNE MOT. SUMM. J. at 5, ECF No. 55.

After attending the meeting, Burkett reported to Jennifer Carr that "[Preston] has been fired, there was a motion that the City Council put out that says [Preston] cannot come back without an escort, and [Preston] was not in his chair." PLS' RESP. OPP'N. TRIBUNE MOT. SUMM. J. at 5, ECF No. 55.

No one ever actually told Burkett that Preston had been escorted out of the meeting. PLS' RESP. OPP'N. TRIBUNE MOT. SUMM.

---

[5] In the Tribune Motion for Summary Judgment, Tribune claimed that Burkett's assumption that Preston had been escorted out of the meeting was supported by, "[1] the City Council Motion, [2] the fact that it was Mr. Preston's job to attend meetings, [3] Mr. Burkett's observation that the Plaintiff was not present at the meeting, and [4] the fact that Mr. Burkett ha[d] previously witnessed his own employer escort terminated employees from its premises." Tribune Summ. J. Mem. ¶ 8, ECF No. 48. Preston disputes that Burkett relied on anything but the motion and Preston's absence at the meeting. PLS' RESP. OPP'N. TRIBUNE MOT. SUMM. J. at 5, ECF No. 55.

J. at 5, ECF No. 55; accord Tribune Summ. J. Mem. ¶¶ 5-9, ECF No. 48. And neither Burkett nor Carr nor Covil were aware that Preston was out of town on September 4, 2018.[6] Tribune Summ. J. Mem. ¶ 9, ECF No. 48.

WTVR's 11:00 PM news segment reported Preston's termination based on the information that Burkett reported to Jennifer Carr. Tribune Summ. J. Mem. ¶ 10, ECF No. 48. The script for the 11:00 PM broadcast stated,

> And breaking news out of Petersburg. That's where City Council members have unanimously voted . . . to dismiss City Attorney Joeseph[sic] Preston — two years after he was hired. He was escorted out of tonight's regularly scheduled meeting. Council also voted unanimously to make sure Preston is escorted by police anytime he steps into City Hall. The reason for his dismissal is unclear.

Ex. A, ECF No. 48-5 (emphasis added). The script was read "against video Burkett had taken at the City Council meeting" which showed that Preston was absent from the meeting and with "the headline 'City Attorney Joseph Preston Dismissed: Escorted out of Tonight's Regularly Scheduled Meeting'" displayed on the bottom of the screen. PLS' RESP. OPP'N. TRIBUNE MOT. SUMM. J. at 5, ECF No. 55 (emphasis added).

---

[6] Preston argues that, based on Covil's text message exchange with Ferrell-Benevides, Covil had actual knowledge that Preston was not at the meeting. PLS' RESP. OPP'N. TRIBUNE MOT. SUMM. J. at 4, ECF No. 55. As discussed later, the Court does not find that to be a reasonable inference.

It is beyond dispute that Preston was not at the City Council meeting on September 4, 2018. And, therefore, Preston was, of course, not escorted out of the meeting by police officers.

For reasons neither explained nor readily apparent, WTVR never contacted Preston to verify any of the information that it reported. PLS' RESP. OPP'N. TRIBUNE MOT. SUMM. J. at 5, ECF No. 55. And Preston never contacted anyone at WTVR or Tribune to demand a clarification of the story. Tribune Summ. J. Mem. ¶ 14, ECF No. 48. WTVR believed the story was accurate until Preston filed the present action.[7] Tribune Summ. J. Mem. ¶ 14, ECF No. 48. And "[a]fter learning that the Plaintiff was not escorted out of the meeting [from the Complaint filed herein], WTVR immediately corrected the story to remove any reference to that sentence." Tribune Summ. J. Mem. ¶ 15, ECF No. 48.

C.   **Preston's Employment as City Attorney**

Preston and the City Council entered into an employment contract on October 10, 2016. City Summ. J. Mem. ¶ 1, ECF No. 50.

By the terms of the contract, Preston was an at-will employee. City Summ. J. Mem. ¶ 2, ECF No. 50. Nevertheless, the contract contained a severance clause: if Preston was not terminated for cause, he would receive a severance payment equal to half of his

---

[7] Preston maintains that WTVR had actual knowledge that he was not at the meeting at the time the story aired. PLS' RESP. OPP'N. TRIBUNE MOT. SUMM. J. ¶ 8, ECF No. 55. Again, the Court does not find that to be a reasonable inference.

annual salary in one lump sum payment.   Ex. 2 (Petersburg City Attorney Employment Agreement) ¶¶ 13-14, ECF No. 50-3.  If he was terminated for cause, he would be due nothing.  Ex. 2 ¶ 13(B)(c), ECF No. 50-3.  The contract defined "cause" to include

> malfeasance or misfeasance; material violation of City policy rule or regulation; criminal or civil misconduct; unsatisfactory performance; failure to maintain active status in the Virginia State Bar; a finding by the state bar or any court of a breach of the rules of ethics of the Commonwealth; or any other behavior or conduct that would adversely affect the confidence of the public or the Integrity of the City. Termination under this paragraph[] does not require any advance notice to the Employee.

Ex. 2 ¶ 13(B)(c), ECF No. 50-3; City Summ. J. Mem. ¶ 2, ECF No. 50.

The City Council now contends that, while Preston was the city attorney, he committed a number of acts that could constitute "cause" for his termination.  City Summ. J. Mem. ¶¶ 9-27, ECF No. 50.  By the City Council's telling, (1) Preston improperly used the city-owned Dogwood Trace Golf Course for free and attempted to have his guests pay the city employee rate; (2) Preston received a performance rating of 2.76 out of 5 with several scores of "unsatisfactory"; (3) "The Mayor testified that the City Council did not think that Preston had sufficient knowledge of municipal

10

law to serve as a city attorney"[8]; And, (4) Preston was known to yell at employees.  City Summ. J. Mem. ¶¶ 9-27, ECF No. 50.

During one of the occasions that Preston was heard disagreeing with an employee, Stephanie Harris, the City Manager, Ferrell-Benavides, and Council Member Cuthbert overheard and intervened. City Summ. J. Mem. ¶¶ 14-18, ECF No. 50.  And, on August 19, 2018, Preston was reported to have had a disagreement with a female employee of Dogwood Trace Golf Course.  According to the City Council, that was the third time that Preston was reported to have "yelled," "verbally abused," or "had a disagreement" with a female employee.  City Summ. J. Mem. ¶¶ 15, 21, 23, ECF No. 50.

Preston disputes the City's recounting of the events leading up to his termination.  First, Preston maintains that Mayor Samuel Parham offered "[Preston] and his guests free golf privileges at Dogwood Trace Golf Course."[9]  PLS' RESP. OPP'N. CITY MOT. SUMM. J. ¶ 5, ECF No. 56.  Second, Preston maintains that he had his guests pay the "city rate" because that was what the Dogwood Trace

---

[8] Preston disputes that the cited deposition testimony supports this statement.  PLS' RESP. OPP'N. CITY MOT. SUMM. J. ¶ 6, ECF No. 56.  Having read the provided excerpts of Parham's testimony, see Ex. 7, ECF No. 50-8, the Court agrees that the cited provisions are insufficient to support the statement, but the rest of the provided testimony in support of the statement is accurate.

[9] The City denies this and points to a clause in Preston's contract stating that "[a]ny prior discussions or representations by or between the Parties are merged into and rendered null and void by this Agreement."  City Summ. J. Mem. ¶¶ 2,9, ECF No. 50; Ex. 2 ¶ 19(A), ECF No. 50-3.  It is unclear when the Mayor made that offer.

employees told Preston that his guests needed pay.  PLS' RESP. OPP'N. CITY MOT. SUMM. J. ¶ 6, ECF No. 56.  Third, Preston asserts that his average performance review score was brought down by the ratings given Council Members Wilson-Smith and Cuthbert, the two City Council members who introduced the motions against Preston. PLS' RESP. OPP'N. CITY MOT. SUMM. J. ¶¶ 7-8, ECF No. 56. Specfiically, Preston reports that "Cuthbert and Wilson-Smith were the only council members to have given Plaintiff a rating of 1 ["Unsatisfactory"] out of 5 in any subsection, and only Cuthbert averaged to a 1 out of 5 in any subsection." PLS' RESP. OPP'N. CITY MOT. SUMM. J. ¶ 8, ECF No. 56. "Plaintiff's overall ratings by the City Council, less Cuthbert's amended ratings, was 3.04, correlating to a 'Meetings Job Standard' rating. . . . Plaintiff's overall rating with Cuthbert's ratings dropped his score to a 2.76." PLS' RESP. OPP'N. CITY MOT. SUMM. J. at 4, ECF No. 56 (citations omitted).  Finally, Preston disputes the City Defendant's descriptions of his interactions with various employees, see PLS' RESP. OPP'N. CITY MOT. SUMM. J. ¶¶ 10-20, ECF No. 56.

Preston and the City Council are obviously far apart on many of these facts, and, unsurprisingly, Preston and the City Defendants dispute whether Preston was terminated for cause. See City Summ. J. Mem. ¶ 4, ECF No. 50; PLS' RESP. OPP'N. CITY MOT.

SUMM. J. at 23-25, ECF No. 56.  Nevertheless, there are two notable points of agreement that are worth discussing.

First, after Ferrell-Benavides and Cuthbert intervened in the dispute between Preston and Stephanie Harris, the incident was discussed at a closed city council meeting and an independent hearing officer from Virginia State University was brought in. PLS' RESP. OPP'N. CITY MOT. SUMM. J. at 5, ECF No. 56.  That independent officer determined that Preston "did nothing wrong" in his interactions with Harris and "was just doing his job."  PLS' RESP. OPP'N. CITY MOT. SUMM. J. at 5, ECF No. 56.  That fact permits a strong inference that "cause" for termination could not have been based on the incident involving Harris.

Second, Cuthbert and Preston had a tense relationship.  See PLS' RESP. OPP'N. CITY MOT. SUMM. J. at 4-5, ECF No. 56.  In addition to what was noted above, in June 2018, "at the request of every council member except Wilson-Smith and Lee-Smith, [Preston] wrote a cease and desist letter to Cuthbert for using his personal legal letter head for city council matters."  PLS' RESP. OPP'N. CITY MOT. SUMM. J. at 5, ECF No. 56.  But the letter was "leaked to Cuthbert by Wilson-Smith prior to delivery, causing the other council members to refuse to sign it."  PLS' RESP. OPP'N. CITY MOT. SUMM. J. at 5, ECF No. 56.  According to Preston, "Cuthbert was upset about the cease and desist letter."  PLS' RESP. OPP'N. CITY MOT. SUMM. J. at 6, ECF No. 56.

13

Then, on September 4, 2018, Council Member Wilson-Smith introduced the motion calling for Preston's termination, and Council Member Cuthbert introduced the motion banning Preston from City Hall unless he entered by appointment, with a police officer, for the purpose of retrieving his personal items. City Summ. J. Mem. ¶¶ 4-5, ECF No. 50. Cuthbert was apparently the author of both of those motions. PLS' RESP. OPP'N. CITY MOT. SUMM. J. at 6, ECF No. 56. In any event, Cuthbert's motion notwithstanding, Preston was able to return "to City Hall without being accompanied by a police officer[,]" and he "was not asked to leave City Hall or prohibited from transacting his business." City Summ. J. Mem. ¶ 6, ECF No. 50.

The Defendants' summary judgment motions must be decided in perspective of this record.

## II.  DISCUSSION

### A.  Standard of Review

A district court should grant a party's motion for summary judgment where the moving party demonstrates that there are no genuine issues of material fact, and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). An issue is "genuine" if a reasonable jury could return a verdict for the non-moving party. Jacobs v. N.C. Admin. Office of the Courts, 780 F.3d 562, 568 (4th Cir. 2015). A fact is "material" if, based on the governing law, it could affect the outcome of the suit. Id.

14

"[A] complete failure of proof concerning an essential element of the nonmoving party's case renders all other facts immaterial." Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986) (internal quotation marks omitted).

To successfully oppose a motion for summary judgment, the nonmoving party must show that there are specific facts that create a genuine issue for trial. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986). And, "[c]onclusory or speculative allegations do not suffice to oppose a properly supported motion for summary judgment, nor does a mere scintilla of evidence." Matherly v. Andrews, 859 F.3d 264, 280 (4th Cir. 2017) (quoting Thompson v. Potomac Elec. Power Co., 312 F.3d 645, 649 (4th Cir. 2002)) (internal quotation marks omitted). Consequently, summary judgment is appropriate where "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party . . . ." United States v. Lee, 943 F.2d 366, 368 (4th Cir. 1991).

When evaluating a motion for summary judgment, the district court must view the evidence in the light most favorable to the non-moving party. Jacobs, 780 F.3d at 568. That includes drawing all reasonable inferences in favor of the non-moving party. Ballinger v. North Carolina Agricultural Extension Service, 815 F.2d 1001, 1004 (4th Cir. 1987). The court must also refrain from weighing the evidence or making credibility determinations.

_Jacobs_, 780 F.3d at 569.    "'Summary judgment cannot be granted merely because the court believes that the movant will prevail if the action is tried on the merits.'"    _Jacobs_, 780 F.3d at 568 (quoting 10A Charles Alan Wright & Arthur R. Miller et al., _Federal Practice & Procedures_ § 2728 (3d ed. 1998)).

Guided by these principles, the Court assess each summary judgment motion in turn.

## B.    Claim Against Tribune

In Count III, Preston alleges that WTVR, made a defamatory[10] statement when it reported that Preston "was escorted out" of the September 4, 2018 City Council meeting "while at the same time stating '[City] Council voted unanimously to make sure he [Joseph Preston] is escorted by police anytime he steps into City Hall.'" AC ¶¶ 52-53, ECF No. 20.

Tribune responds that, as a public official, Preston can only make out a claim for defamation if he can show that WTVR acted with "actual malice." Tribune Summ. J. Mem. at 2-3, ECF No. 48. And, says Tribune, no reasonable jury could find that WTVR acted with actual malice. Tribune Summ. J. Mem. at 2, ECF No. 48.

In response, Preston makes three arguments. First, he argues that, because he was fired during the meeting, he was no longer a

---

[10] For the reasons that follow, the fact that Preston claims that the statement was defamation _per se_ is irrelevant because the Court does not reach the question of whether WTVR's news report had the requisite "sting" to be defamatory.

public official by the time Tribune aired the allegedly defamatory statement, and therefore, he need not prove that WTVR acted with "actual malice," but rather simple negligence.  PLS' RESP. OPP'N. TRIBUNE MOT. SUMM. J. at 8, ECF No. 55.  Next, Preston argues that, even if he were still a public official, WTVRs's story was not related to his official conduct, and so again, he would only need to prove that WTVR acted negligently.  PLS' RESP. OPP'N. TRIBUNE MOT. SUMM. J. at 8, ECF No. 55.  And finally, Preston argues that, even if the Court were to find that he was a public official and that WTVR's statement was related to his official conduct, there is, nevertheless, sufficient evidence on the record to show that there is a genuine issue as to whether or not Tribune acted with actual malice.  PLS' RESP. OPP'N. TRIBUNE MOT. SUMM. J. at 10, ECF No. 55.

Preston is mistaken on all three points.

### 1.  Defamation Generally

To make out a claim for defamation, a plaintiff must show that there was "'(1) publication of (2) an actionable statement with (3) the requisite intent.'"  Schaecher v. Bouffault, 772 S.E.2d 589, 594 (Va. 2015) (quoting Tharpe v. Saunders, 737 S.E.2d 890, 892 (Va. 2013)).  A statement is actionable if it is both false and defamatory.  Schaecher v. Bouffault, 772 S.E.2d 589, 594 (Va. 2015).  A statement is defamatory if it "'tends to injure one's reputation in the common estimation of mankind, to throw

17

contumely, shame, or disgrace upon him, or which tends to hold him up to scorn, ridicule, or contempt, or which is calculated to render him infamous, odious, or ridiculous.'" Schaecher v. Bouffault, 772 S.E.2d 589, 594 (Va. 2015) (quoting Moss v. Harwood, 46 S.E. 385, 392 (Va. 1904)).

The requisite intent that a plaintiff must prove to make out a claim for defamation varies based on whether the plaintiff is a private figure or a public figure (sometimes referred to as a "public official"). Where the plaintiff is a private figure, he or she must show, by a preponderance of the evidence, that the statement was false and "that the defendant either knew it to be false, or believing it to be true, lacked reasonable grounds for such belief, or acted negligently in failing to ascertain the facts on which the publication was based." Gazette, Inc. v. Harris, 325 S.E.2d 713, 725 (Va. 1985); Hyland v. Raytheon Tech Servs. Co., 670 S.E.2d 746, 750 (Va. 2009). In contrast, where the plaintiff is a public figure, he or she must show, by clear and convincing evidence, that the defamatory falsehood was (1) related to the plaintiff's official conduct and (2) made with "actual malice," (i.e., knowledge that the statement was false or reckless disregard for whether the statement was false or not). New York Times Co. v. Sullivan, 376 U.S. 254, 279-80 (1964); Gertz v. Robert Welch, 418 U.S. 323, 342 (1974).

2.   **Public Official**

Preston acknowledges that a city attorney is a public figure, but he argues that he was no longer the city attorney (and thus no longer a public figure) when the news report aired.  See PLS' RESP. OPP'N. TRIBUNE MOT. SUMM. J. at 8, ECF No. 55.  Without doubt, Reston's service as City Attorney had been terminated when the Tribune story aired.  However, that does not mean that, in defamation jurisprudence, he was no longer a "public figure" or "public official."

The concept of "public figure" or "public official" is defined by constitutional protections for free speech not state-law definitions developed for "local administrative purposes." Rosenblatt v. Baer, 383 U.S. 75, 84 (1966).  And, for the purposes of protecting the public's right to criticize the government, including former officials, the fact that an individual left a position as a public official before the defamatory statement in question was made has no "decisional significance" if the performance of the former official's duties is still a matter of public concern.  Rosenblatt v. Baer, 383 U.S. 75, 87, n.14 (1966).

Although "there may be cases where a person is so far removed from a former position of authority that comment on the manner in which he performed his responsibilities no longer has the interest necessary to justify" treating him as a "public figure," if the matters overseen by the former official are still a subject of

19

"lively public interest," the former official is still functionally a public figure for the purposes of a defamation claim. Rosenblatt v. Baer, 383 U.S. 75, 87, n.14 (1966). Here, the Court finds that, given that WTVR's story aired the same day that Preston was terminated, Preston's performance of his duties as city attorney and his termination from that position — which implicated both the quality of his past performance and the question of who would fulfill those duties in the future — was very much still a matter of public concern. Thus, for purposes of assessing Tribune's motion for summary judgment, Preston will be regarded as a "public figure."

### 3.   Official Conduct

Next, Preston argues that, even if he were a public figure when the news report aired, WTVR's report did not relate to Preston's official conduct. See PLS' RESP. OPP'N. TRIBUNE MOT. SUMM. J. at 8, ECF No. 55. But again, Preston is mistaken.

Much like the term "public official," "official conduct" is not strictly limited to the "customary meaning" of that term. See Monitor Patriot Co. v. Roy, 401 U.S. 265, 274 (1971). "'Anything which might touch on an official's fitness for office' can constitute "official conduct." Monitor Patriot Co. v. Roy, 401 U.S. 265, 274 (1971) (quoting Garrison v. Louisiana, 379 U.S. 64, 72 n.8 (1964)). And, courts have indeed interpreted "anything" to mean almost anything. See Dixon v. Int'l Bhd. of Police Officers,

20

504 F.3d 73, 88 (1st Cir. 2007) ("So many things can 'touch on' someone's 'fitness for office' that this restriction to the actual malice standard is very rarely applied." ); Buendorf v. National Pub. Radio, Inc., 822 F. Supp. 6, 12 (D.C. Cir. 1993) ("The Supreme Court and lower courts have construed the rule of New York Times Co. v. Sullivan to include almost any comment regarding a public official."). This liberal interpretation of "official conduct" "protects the paramount public interest in a free flow of information to the people concerning public officials, their servants." Garrison v. Louisiana, 379 U.S. 64, 77 (1964).

Under the liberal definition of "official conduct" employed by the federal courts, Preston's termination – and the circumstances surrounding it – falls into the definition of "official conduct."

### 4.   Actual Malice

Finally, Preston argues that, even if he were a public figure, and the broadcast related to his official conduct (such that the standard of proof was "actual malice"), there is indeed evidence of "actual malice," or at least evidence sufficient to show that there is a genuine issue of material fact as to whether WTVR acted with "actual malice."

Preston makes four arguments to support his position. First, he argues that the text message from Ferrell-Benevides to Covil, a WTVR reporter, meant that WTVR had actual knowledge that Preston

was never at the September 4 City Council meeting.  See PLS' RESP.
OPP'N. TRIBUNE MOT. SUMM. J. at 10, ECF No. 55.  Next, relying on
Jordan v. Kollman, 612 S.E.2d 203 (Va. 2005), Preston argues that
"Burkett totally fabricated the allegation that Plaintiff had been
escorted out of the City Council meeting."  PLS' RESP. OPP'N.
TRIBUNE MOT. SUMM. J. at 10, ECF No. 55.  Then, relying on Gilmore
v. Jones, 370 F. Supp. 3d 630 (W.D. Va. 2019), Preston argues that
"Burkett departed from journalistic standards by failing to
investigate." PLS' RESP. OPP'N. TRIBUNE MOT. SUMM. J. at 11, ECF
No. 55.  And, finally, Preston argues that "there is conflicting
evidence in the record whether Carr had information about the text
message Covil received from Ferrell-Benevides which, again,
clearly stated that the Plaintiff was not at the meeting."  PLS'
RESP. OPP'N. TRIBUNE MOT. SUMM. J. at 11-12, ECF No. 55.

### a. Actual Malice Generally

A defendant acts with "actual malice" if he or she publishes
a statement "with knowledge that it was false or with reckless
disregard of whether it was false or not."  St. Amant v. Thompson,
390 U.S. 727, 728 (1968); New York Times Co. v. Sullivan, 376 U.S.
254, 279-80 (1954).  What counts as "reckless disregard" will
ultimately need to be decided on a case-by-case basis, but there
are some hard rules.  See St. Amant v. Thompson, 390 U.S. 727,
730-31 (1968).  Most importantly, "reckless conduct is not measured
by whether a reasonably prudent man would have published, or would

22

have investigated before publishing"; rather, "[t]here must be sufficient evidence to permit the conclusion that the defendant <u>in fact entertained serious doubts</u> as to the truth of his publication." <u>St. Amant v. Thompson</u>, 390 U.S. 727, 731 (1968) (emphasis added).

That said, a defendant cannot stop a defamation claim merely by testifying that he or she believed the statements in question were true. Rather, "[t]he finder of fact must determine whether the publication was indeed made in good faith." <u>St. Amant v. Thompson</u>, 390 U.S. 727, 732 (1968). Examples of "bad faith" or reckless publication include (1) "where a story is fabricated by the defendant, is the product of his imagination, or is based wholly on an unverified anonymous telephone call"; (2) where "the publisher's allegations are so inherently improbable that only a reckless man would have put them in circulation"; and (3) where "there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports." <u>St. Amant v. Thompson</u>, 390 U.S. 727, 732 (1968).

Moreover, it is a cardinal rule for defamation jurisprudence that "[f]ailure to investigate does not in itself establish bad faith." <u>St. Amant v. Thompson</u>, 390 U.S. 727, 733 (1968); <u>Ryan v. Brooks</u>, 634 F.2d 726, 733 (4th Cir. 1980). And, summarizing a source's words does not automatically mean a journalist published a story with actual malice, even where the journalist uses

"slightly stronger" language than his or her source.  Cf. Ryan v. Brooks, 634 F.2d 726, 733 (4th Cir. 1980) ("The historian's job is not to copy statements exactly as written in a secondary source, but to interpret and rework them into the whole.").

Here, a reasonable jury could not render a verdict in favor of Preston because the evidence that Preston has put forth against Tribune simply would not support a finding of actual malice.

### b.   The Import of the Text Messages

The linchpin in Preston's argument is that, as a result of City Manager Ferrell-Benevides' text message to Covil, Burkett had actual knowledge that Preston was never at the City Council meeting.   That is simply not a reasonable inference to draw from Ferrell-Benevides' text messages.[11]  After learning from Ferrell-Benevides, via text message, that Preston had been fired, Covil responded, "Wow. Good for them. Thx for letting me know[.] Is he even there?"  Ex. 2, ECF No. 48-2.   Ferrell-Benevides replied, "Nope[.] Immediately and to only be allowed back to pack under supervision."  Ex. 2, ECF No. 48-2.  With the benefit of 20/20 hindsight, it is clear that the text exchange between Ferrell-Benevides and Covil was not as clear as it seemed to Covil at the

---

[11] Although a court evaluating a summary judgment motion must view evidence in the light most favorable to the non-moving party (here the plaintiff), the court is not required to draw unreasonable inferences in the non-moving party's favor.  See Scott v. Harris, 550 U.S. 32, 378 (2007).

time he relayed his understanding to WTVR producer Jennifer Carr. However, Covil submitted a declaration saying that he "did not understand the text message [he] received from the City Manager to mean that Mr. Preston had never been at the meeting." Ex. 2 at 3, ECF No. 48-2. And the Court has not been made aware of any direct evidence that any WTVR employee had actual knowledge to the contrary. Rather, Preston makes an argument about the most reasonable interpretation of the text message exchange and presents circumstantial evidence to support his claim that WTVR had "actual knowledge."

The Court finds that Covil's interpretation of Ferrell-Benevides' text messages was a reasonable interpretation even if it was not the only reasonable interpretation. Where a news outlet adopts one of multiple reasonable interpretations of a source's statement, no reasonable jury could find that the news outlet acted with "actual malice." CACI Premier Tech., Inc. v. Rhodes, 536 F.3d 280, 296 (4th Cir. 2008) ("[A] speaker or publisher may adopt 'one of a number of possible rational interpretations of [sources] that [contain] ambiguities' without creating a jury issue of actional malice.") (quoting Time, Inc. v. Pape, 401 U.S. 279, 290 (1971)) (alternation in original).

The Court, therefore, does not find persuasive Preston's argument that there is a factual dispute over whether Jennifer Carr "actually had information about the text message Covil

received from Ferrell-Benevides." PLS' RESP. OPP'N. TRIBUNE MOT.
SUMM. J. at 11-12, ECF No. 55. Because the text messages were, at
best, ambiguous, and because the Court is not aware of any evidence
suggesting that Carr's interpretation would have differed from
Covil's interpretation, any factual dispute about Carr's knowledge
of the text messages is immaterial.

   c.   **Fabrication Argument**

   Next, Preston relies on Jordan v. Kollman, 612 S.E.2d 203
(Va. 2005) to support his argument that, in this case, unlike in
Jordan, the story Burkett reported was fabricated and a product of
his imagination. In fact, Jordan bears several similarities to
the present case and suggests that Burkett did not completely
fabricate his story. In Jordan, a citizen took out ads criticizing
a local politician; the ads were based on a newspaper article and
what the citizen knew about a closed city council session. Jordan,
612 S.E.2d at 204, 209. The citizen was actually mistaken in his
interpretation of events, but because there was no obvious reason
to think that the newspaper article was false, the Supreme Court
of Virginia found that there was no "clear and convincing evidence
which would permit the jury to find [the citizen] acted with actual
malice merely because he failed to comprehend the intricacies of
City Council voting procedure." Jordan, 612 S.E.2d at 209-10. In
short, the record did not show, by clear and convincing evidence,
that the citizen's ads were fabricated or a product of his

26

imagination.  Jordan, 612 S.E.2d at 209.  Here, like in Jordan, the primary WTVR reporter, Jon Burkett, based his reporting on a lead from two sources (i.e., his colleagues and an observer, Michael Edwards) and a misunderstanding of city council procedures.  The record does not show that Burkett had any reason to doubt what his colleagues and Mr. Edwards told him.  Cf. St. Amant v. Thompson, 390 U.S. 727, 732 (1968).  The fact that Burkett could have spoken with additional or different sources does not mean he "completely" fabricated a story, particularly when Burkett's story was, in part, based on his own observation that Preston was not at the city council meeting.  Thus, here, as in Jordan, there is no clear and convincing evidence that would allow a jury to find that Burkett's reporting was fabricated or a product of his imagination.  And thus, there is no evidence of "bad faith" to support a claim of actual malice.

### d.   Journalistic Standards

Finally, Preston cites Gilmore v. Jones for the proposition that WTVR deviated from journalistic standards by failing to investigate.  PLS' RESP. OPP'N. TRIBUNE MOT. SUMM. J. at 11, ECF No. 55.  Specifically, Preston says that failing to reach out to the subject of a news story "coupled with allegations that the defendant preconceived a story line and then made false statements to conform to that story line" is sufficient to make out an inference that the news organization published the story with

actual malice.  PLS' RESP. OPP'N. TRIBUNE MOT. SUMM. J. at 11, ECF No. 55; <u>Gilmore v. Jones</u>, 370 F. Supp. 3d 630, 673 (W.D. Va. 2019). However, <u>Gilmore v. Jones</u> is inapposite.  First, WTVR did investigate the story: WTVR sent a reporter to the City Council meeting who observed that Preston was not present and spoke with another observer who confirmed that Preston was not allowed "'to come back on property . . . without an escort.'"  PLS' RESP. OPP'N. TRIBUNE MOT. SUMM. J. at 5, ECF No. 55; Tribune Summ. J. Mem. ¶ 7, ECF No. 48.  On this record, the Court cannot find that the fact that WTVR did not reach out to Preston is probative of actual malice.  <u>St. Amant v. Thompson</u>, 390 U.S. 727, 733 (1968); <u>Ryan v. Brooks</u>, 634 F.2d 726, 733 (4th Cir. 1980).  Second, as noted above, Preston's "actual knowledge" or "fabrication" arguments are not persuasive.  And third, there is no evidence that WTVR made false statements to deliberately conform to a preconceived story line; the record shows that WTVR believed its report was accurate.[12]

### 5. Defamation Summary

On the current summary judgment record, the Court finds that Preston was a public official during the relevant time period; the statement at issue was related to his official conduct; and no reasonable jury could find that WTVR acted with actual malice.

---

[12] One rightly might wonder why a reporter, such as Burkett, would not have reviewed the text of the motions before filing the story. However, Preston cites no authority requiring that to have been done.

Accordingly, there is no need to address whether WTVR's report had the requisite sting to be defamatory or whether WTVR's report was substantially true.

Undoubtedly, the actual malice standard sets a high bar that is difficult for plaintiffs to meet. But the Supreme Court has concluded that the high bar serves to "balance private rights to protection of reputation against the First Amendment rights of writers and publishers to print information on matters of interest to the public[.] Ryan v. Brooks, 634 F.2d 726, 733 (4th Cir. 1980) (quoting Time, Inc. v. Hill, 385 U.S. 374, 389 (1967)).[13]

## C.   Claims Against the City Defendants

### 1. Count I: Breach of Contract Against the City Council

Count I is a breach of contract claim predicated on the theory that the termination of Preston's employment was not for cause. Therefore, says Preston, he is entitled to a severance payment equal to six-months' salary ($77,500) plus pre-judgment interest. FAC ¶¶ 39-40, ECF No. 20.

The City Defendants take a different view. Under the terms of Plaintiffs' employment contract, "cause" is defined broadly to:

---

[13] It recently has been suggested that the bar is too high and that the actual malice rule has no constitutional foundation. McKee v. Cosby, 586 U.S. ____ (2019) (Thomas, J., concurring in denial of certiorari); Tah v. Global Witness Publ'g, Inc., No. 19-7132, 2021 WL 1045205 *15-17, U.S. App. LEXIS 8046 (D.C. Cir. March 19, 2021) (Silberman dissenting). However, it is not for this Court to revisit that topic.

> include malfeasance or misfeasance; material violation
> of City policy rule or regulation; criminal or civil
> misconduct; unsatisfactory performance; failure to
> maintain active status in the Virginia State Bar; a
> finding by the state bar or any court of a breach of the
> rules of ethics of the Commonwealth; or any behavior or
> conduct that would adversely affect the confidence of
> the public or the Integrity of the City.

City Summ. J. Mem. at 3, ECF No. 50; Ex. 2 at 5, ECF No. 50-3.

Given that broad definition and Preston's conduct (as described by

the City Defendants), the City Defendants maintain that Preston

was fired for cause.  City Summ. J. Mem. at 18-19, ECF No. 50.

The Court finds that the record on this issue does not lend

itself to summary judgment.  Preston correctly points out that the

motion which effected his termination did not explain why Preston

was terminated.  The motion, of course, did contain the conclusory,

equivocal and curious statement about cause cited above (i.e.,

"[t]o the extent that contractual provisions, if any may apply,

Mr. Preston is terminated for cause.").   Ex. 2, ECF No. 55-2.

However, from that enigmatic text one might reasonably infer that

the reasons for Preston's termination was not based on his

employment contract at all.  Thus, considering that inference, and

given: (1) the absence from the termination motion of any cited

cause whatsoever; (2) the showing that Preston has made about the

difficulties that existed from time to time between Preston and

other city employees, (3) the fact that the independent hearing

30

officer found that Preston did nothing wrong when he was at odds
with Stephanie Harris, and (4) the length of time between the
termination motion and the other reasons to which the City
Defendants point in their brief, a reasonable jury could conclude
that the statement about cause was simply pretext designed to avoid
the payment of $77,500 to Preston.

### 2.   Count II: Defamation Against the Individual City Council Members

In Count II, the AC presented a claim asserted to be
"DEFAMATION PER SE AGAINST THE CITY COUNCIL DEFENDANTS." (ECF No.
20, pp. 8-9, ¶¶ 41-50). In paragraph 42 of the AC, Preston asserted
that the claim was against the City Council, by and through its
individual members in their individual capacities. After the City
Council moved for summary judgment asserting sovereign immunity,
the Court, at Preston's request, voluntarily dismissed the City
Council as a defendant. PL.'S RESP. DEFS.' SUPPL. BR. SUPP. MOT.
SUMM. J., ECF No. 72; ORDER, ECF No. 73.

Thus, what remains of Count II is a defamation claim against
the individual Petersburg City Council members (i.e., Treska
Wilson-Smith, Darrin Hill, Samuel Parham, Charlie Cuthbert, W.
Howard Myers, Annette Smith-Lee, and John A. Hart, Sr.) in their
individual capacities.[14]  According to Preston, those defendants

---

[14]  Their brief noted that the City Councilors asserted they would
be entitled to sovereign immunity on "Preston's official capacity
claims." City Mot. for Summ. J. at 13, n.1, ECF No. 50. However,

allegedly defamed Preston, again as individuals, by unanimously passing a motion, introduced by Council Member Cuthbert (with whom Preston had a poor relationship) that restricted Preston's ability to enter City Hall without a police escort.[15]  See AC ¶¶ 42-43.  In other words, those defendants, as individuals, somehow were each acting with the requisite defamatory intent, (i.e., actual malice), when, as City Council members, they voted to pass a resolution restricting Preston's access to the building.[16]

Quite frankly, it is difficult to fathom how a member of a City Council can commit, as an individual, an act of defamation by voting for a motion on which that person is entitled to vote only in an official capacity.  But, if that were possible, then, to the extent that Preston's defamation claim is intended to be asserted against the individual City Council members, it must be against

---

Preston's claims were quite clearly brought against the individual city councilors in their individual capacities.  AC ¶ 42, ECF No. 20.

[15] The defamation claim is <u>not</u> directly based on the first motion passed by the City Council which terminated Preston.  <u>See</u> AC ¶ 42.

[16] The City Council members have not asserted legislative immunity. And, for the purposes of summary judgment, the City Council members did not assert immunity under Va. Code § 8.01-223.2 or common law qualified privilege.  <u>But see</u> BR. IN SUPP. OF MOT. TO DISMISS PL.'S AM. COMPL. at 9-12, ECF No. 22 (asserting that the individual council members are immune from a defamation suit via Va. Code § 8.01-223.2, which protects statements made a public hearing before the governing body of any locality, and a qualified privilege which protects, among other things, certain employment discussions). That argument was not made on summary judgment and will not be addressed.

them in their official capacities.  As Preston acknowledged in asking for dismissal of Count II against the City Council, it enjoyed sovereign immunity from a tort suit for damages.  So too would the individual members of the City Council who, in their official capacities, voted in favor of the second motion.

But, if somehow that were not the case, the previously made actual malice analysis would entitle the City Council members to summary judgment.

### a. Actual Malice v. Ill Will

For the reasons discussed in Part II.B, Preston is a public figure.  Thus, to make out a claim for defamation, Preston must show, by clear and convincing evidence, that the second motion was passed with actual malice.  A statement is made with "actual malice" if it is made with the knowledge that the statement was false or with reckless disregard for whether the statement was false or not.  New York Times Co. v. Sullivan, 376 U.S. 254, 279-80 (1964); Gertz v. Robert Welch, 418 U.S. 323, 342 (1974).  The actual malice standard cannot be met solely with evidence of ill will or common law malice.  Reuber v. Food Chemical News, Inc., 925 F.2d 703, 715 (4th Cir. 1991).  However, evidence of ill will can still be relevant to the question of whether "actual malice" exists.  Spirito v. Peninsula Airport Commission, 350 F.Supp.3d 471, 482 (E.D. Va. 2018).

Thus, in this case, Preston's burden is to show, by clear and convincing evidence,[17] that a jury could find that the individual city council members realized that the motion, or at least its implication, was false or they each had to subjectively entertain serious doubts as to whether that fact was true.  See Bose Corp v. Consumers Union of the United States, Inc., 466 U.S. 485, 511, n.30 (1984).  He simply has not met that burden on the current record.

### b. Analysis

Preston argues that the second city council motion:

> inferred, implied, implicated or insinuated false statements of facts that Plaintiff is mentally unstable, would become violent upon learning of his termination, would commit violent, felonious, or criminal acts in response to the termination of his employment, and cannot be trusted as a law abiding citizen of the Commonwealth, as an [sic] licensed attorney and officer of the Court [sic], and as a former City Attorney of the City of Petersburg to be alone in City Hall, a public space, where he once worked, without a specifically designated City of Petersburg Police escort.

AC ¶ 44, ECF No. 20.  For the sake of argument, the Court will assume, without deciding, that Preston is correct and that such an inference would be defamatory.

However, Preston cannot show that the individual defendants acted with actual malice.  First, Preston has not put forth any

---

[17] The applicable burden of proof applies when analyzing a summary judgment motion.  Anderson v. Liberty Lobby, Inc., 472 U.S. 242 (1986).

evidence that five of those defendants (i.e., Darrin Hill, Samuel Parham, W. Howard Myers, Annette Smith-Lee, and John A. Hart, Sr) acted with adverse animus of any kind.   Thus, his defamation claim against those defendants fails for that reason alone.   Second, even assuming that Cuthbert and Wilson-Smith had a personal dislike of, and tense relationship with, Preston, personal dislike alone is not sufficient to support a finding of actual malice.[18]  Nor is proof of a tense relationship.   On this record, no reasonable jury could find that Cuthbert or Wilson-Smith passed the second motion with the knowledge that any implications of the motion were false or with reckless disregard for whether the implications were false or not.   In other words, there is simply no evidence on which a reasonable jury could find that Cuthbert or Wilson-Smith acted with actual malice.     The City Motion for Summary Judgment is granted with respect to Count II.

### 3.   Count IV: Declaratory Judgment Against City Council

Finally, as to Count IV, Preston's sole complaint is that the City Council exceeded "its authority, the law and violated the Plaintiff's legal and constitutional rights in its special meeting

---

[18] Also, there is evidence that both Cuthbert and Mayor Parham thought the second motion was warranted to protect city employees. City Mot. for Summ. J. at 9, ECF No. 50.   And Mayor Parham also believed the motion might be necessary to protect sensitive documents.   City Mot. for Summ. J. at 9, ECF No. 50.   Preston has offered no evidence to create a genuine dispute of fact as to that point.

motion . . . banning Plaintiff from entering City Hall with [sic] a police escort."[19] AC ¶ 66, ECF No. 20.  Significantly, there is no delineation in Count IV as to which Constitutional and legal rights have allegedly been violated.  See AC ¶ 66, ECF No. 20.  In his response brief, Preston mentions — for the first time — violations of his due process and equal protection rights under both the Virginia and United States Constitutions.  PLS' RESP. OPP'N. CITY MOT. SUMM. J. at 20-23, ECF No. 56.  As the City Defendants' reply brief points out, however, there is not even an allegation of an equal protection violation because there is no contention in the Amended Complaint or elsewhere in the record that Preston was treated differently because of some protected or impermissible classification. REPLY BR. SUPP. MOT. SUMM. J. at 9-10, ECF No. 59.  That leaves the due process claim.  The City Defendants, citing Cloaninger v. McDevitt, 555 F.3d 324, 326 (4th Cir. 2009), assert that Preston cannot raise this claim anew in the opposition to summary judgement.  REPLY BR. SUPP. MOT. SUMM. J. at 9-11, ECF No. 59.  The Court agrees.  The City Motion for Summary Judgment is granted with respect to Count IV.

---

[19] The claim fails Twombly and Iqbal on its face, but that is not how the matter was briefed for summary judgment.

### III.   Conclusion

For the foregoing reasons, the Tribune Motion for Summary Judgment (ECF No. 47), addressing Count III, will be GRANTED and the City Motion for Summary Judgment (ECF No. 49) will be DENIED with respect to Count I and GRANTED with respect to Counts II and IV.   The City Defendants' improperly presented request for costs and attorneys' fees will be denied without prejudice to the presentation of a properly presented, documented motion for an award of attorneys' fees and costs, if such a motion can be presented.

It is so ORDERED.

/s/

Robert E. Payne
Senior United States District Judge

Richmond, Virginia
Date: March 26, 2021